## PEOPLE v. KIRWAN.

(Supreme Court, General Term, First Department. February 17, 1893.)

1. ATTEMPT TO RAPE—EVIDENCE—CORROBORATION.

To establish the crime "of an attempt to commit rape," it is not essential that the testimony of the female on whom the alleged attempt was made be corroborated by other evidence.

2. SAME.

In a trial for an attempt to commit rape the prosecuting witness testified that defendant called at her house to consult her about the sale of certain land, and, on being taken into the parlor, upstairs, he closed the door, seized her by the hands, shoved her against the wall, put his body against her, and unbuttoned his trousers; that a violent struggle occurred; that she finally broke loose from him, and took refuge in her bedroom. In a prior trial she testified that, prior to the date of the alleged assault, he had called at her house, and had then made indecent advances. During the time of the alleged assault, which occurred near the middle of the day, she made no outcry, and no steps were taken to punish defendant till nearly a month later. Complainant also testified that she sustained no physical or mental injury as a result of the alleged assault. Witnesses for defendant testified that he had previously borne a good character. *Held*, that the evidence did not warrant a conviction of an attempt to commit rape, and that, at most, he could only be convicted of indecent assault.

3. SAME—INSTRUCTIONS—INDECENT ASSAULT.

An instruction that if defendant, in making the assault, did not intend to have sexual intercourse with her, he would be guilty only of an indecent assault, is erroneous, in that, even if defendant intended to have sexual intercourse with her, he would not have been guilty of an attempt to commit rape, unless he intended to have sexual intercourse with her "against her will."

Appeal from court of general sessions, New York county.

John P. Kirwan was convicted of assault in the second degree, and appeals. . Reversed.

Argued before VAN BRUNT, P. J., and O'BRIEN and PATTERSON, JJ.

Howe & Hummel, for appellant.

De Lancey Nicoll, Dist. Atty., (Henry H. B. Stapler, Asst. Dist. Atty., of counsel,) for respondents.

O'BRIEN, J. The appellant was convicted of the offense of assault in the second degree, and sentenced to be imprisoned in the penitentiary for the term of two years and two months. The indictment charged the defendant with an assault upon one Mrs. Allan, with an intent to commit a felony, to wit, "with intent to commit an act of sexual intercourse with her."

To establish the crime of rape, a complainant's evidence must be corroborated. The indictment, as stated by the learned recorder, "is, substantially, what the law calls an attempt to commit rape." The question is therefore presented whether or not corroboration is necessary to sustain a complainant in charging either "an attempt to commit rape," or an assault with intent to commit rape; these being substantially, if not identically, the same offense expressed in two different ways. The Penal Code, however, while requiring, by section 283, that no conviction can be had for rape upon the testimony of the female, unsupported

by other evidence, does not in express terms require such corroboration in respect to the assault with intent to commit rape. Rape and an assault with intent to commit rape are distinct crimes, and as corroboration was not essential to convict of either offense at common law, and as the statutory rule contained in the Penal Code speaks only of rape, we are of opinion that the recorder was correct in his ruling, refusing to charge, as requested by the prisoner's counsel, "that, before the defendant can be convicted of the offense charged in the indictment, there must be evidence tending to corroborate the complainant as to the commission of the act charged. Without such corroboration the defendant cannot be convicted."

While corroboration is not, therefore, necessary, taking into consideration the nature of the charge, where a complainant's testimony is unsupported, it should be, as in a case where supported, of a character so conclusive as to leave no reasonable doubt of the prisoner's guilt. No one having been present at the interview between the complainant and the prisoner when the crime is alleged to have been committed, and the conviction having been secured on the complainant's evidence alone, contradicted as it was by the prisoner, this should be examined and analyzed to see if it has such force and weight as to justify a conclusion that the prisoner was guilty of the crime charged, beyond a reasonable doubt. It is true that upon collateral matters, and to discredit the prisoner's version, other witnesses were introduced; but on the main, substantial charge the conviction was obtained solely upon the complainant's testimony. This necessitates an examination of the record to determine if justice requires the affirmance of the judgment.

The prisoner, a real-estate agent, first called at complainant's house in the month of April; and prior to May 20, 1891, which is the date fixed when the crime is alleged to have been committed, he made a second call, both with reference to a sale of property owned by Mrs. Allan or her husband. Her version, given upon the trial, of what took place on May 20th, is thus detailed: She let the prisoner in, and upon his stating that he had some papers which he would like her to sign, in connection with the sale of the property, she invited him upstairs, into the parlor, which was on the second story, (it being an English basement house,) where she kept the pen and ink. That the defendant closed the door as he went in. That, when the complainant went to open it, he seized hold of her hands, and prevented her from doing so. That he put her against the wall, put his knee against her, and also put the side of his body against her; took her two hands, put them under his arm, somehow, and unbuttoned his trousers. That he then put his shoulder against her, then, with one hand, got hold of her, and pushed her right against the wall. That she could not see what he was doing with his other hand, but could feel that he was unbuttoning his trousers. Then there was quite a struggle, and the following conversation is stated to have taken place between the parties:

"I told him, if he did not let go, I would tell his wife, and I would also have the law on him. He laughed at me, and said I ought to feel myself very highly flattered; that a great many handsome women in New York had offered them-

selves to him, and that he had never paid a dollar. He said that, if I put the law on him, that he did not fear arrest, and he said that there was no judge in New York that would convict him. He said he was a Tammany boy, and had a great pull, and said that my social position was nothing, and said, as for my name, he said he would have no regard for the truth."

'Prior to the trial the complainant stated her grievance, once in a letter to her husband, and again in the police court. In the former she said:

"As soon as I got in, he shut the door, and caught hold of my hands, and we had a tussle round the room. He unbuttoned his pants, and grabbed me by the leg as I was falling; he having tripped me with his foot. As he did so, it loosened my hands, and I sprang around one of our big arm-chairs, and rushed out of the room. I ran upstairs, in my own bedroom, and bolted it, and watched through the window for an officer; but he went out, himself, before I could see one."

The complainant in the police court recites—

"That on the 20th of May she was indecently assaulted by John P. Kirwan, who came into deponent's parlor, and forcibly attempted to throw deponent down on the floor, and while his person was exposed, he forcibly placed his hand on deponent's thigh."

She further testified upon the trial that on one of his visits prior to May 20th, on being informed that her husband was sick, and absent in Texas, where he intended to remain two years, the prisoner remarked—

"That it was a pity I should be left alone without a husband for two years. I told him that was none of his business; 'I have cut my eyeteeth, and lost them, and I don't want any such talk.'"

Notwithstanding her estimate of the prisoner, she thereafter received his visits until the 20th of May, and then, in the absence of all other persons from the house, she invited him up into her parlor on the second floor. During the 15 minutes spent in that room, while the prisoner was attempting an indecent assault upon her, she testified that she did not scream, or make any outcry whatever, though her house was situated in West Twenty-First street, where persons at that time in the morning—between 10 and 11 o'clock—were undoubtedly passing. We are thus left to conclude that in the way of noise or outcry, outside the struggle, there was only the conversation already detailed. From that time (May 20th) no steps were taken to punish the prisoner until June 23d, when the complaint was made to a police magistrate. The letter to her husband was on June 25th. It is true she gives her explanation of why she did not proceed sooner,—that on June 19th she saw her lawyer, which was after the prisoner had called the fourth time, and at her request the attorney wrote a letter in which he said:

"John Kirwan, Esq.—Dear Sir: Mrs. James Allen, of 449 West 21st street, has consulted me as to some annoyances which she claims to have been subjected to by you; and I have advised her that it would be unnecessary to take measures, at present, further than to write you this note, which I trust will have the effect of you to discontinue your visits."

In further explaining her reason for not proceeding sooner, she stated that she did not want her husband, who was sick, to be brought back to the city, or made worse, by knowledge of the prisoner's attack, and that she would not have complained at all, were it not for the prisoner's

subsequent visits. In this connection she was asked, "Did not the attack affect you very much?" and she answered: "No, sir; not very much. I was all right. I was not hurt in any way. Question. It didn't affect you any way? Answer. Not very much." This failure to make a complaint until more than a month after, taken in connection with this testimony, and her lawyer's designation of the offense as "an annoyance," furnishes a probable explanation of what did occur on May 20th. The fact that she did not intend to prosecute, and that she moved because the prisoner subsequently visited her, is consistent with the view that what was designated as "an annoyance" was subsequently enlarged into an indecent assault, finally resulting, upon the testimony, in a conviction of an assault with intent to commit rape. That more occurred than a mere conversation about real estate in the interview between them of May 20th, as testified by the prisoner, the record clearly shows; but that it amounted to an indecent assault, or attempt to commit rape, the testimony does not establish, beyond a reasonable doubt. That the prisoner acted in a vulgar and familiar way from the time of his first visit, is apparent; and his untruthful statement of the advances made was what justly militated against him with the jury. On the other hand, when a female permits undue familiarity in speech, and continues to receive visits from a person whose character is thus laid bare, she is not entitled to have much attention paid to her complaint, except in cases where the man attempts to touch or assault her; thus employing either force or violence causing either mental or bodily suffering. The reason for this is both natural and apparent. A word or look, not to speak of an indelicate suggestion, is enough to put a rightly sensitive woman on her guard; and, after being thus warned, if a woman offers the occasion or opportunity to a disreputable and evil-minded man to see and converse with her alone, she to that extent deprives herself of that jealous regard which the law extends to women who without fault are subjected to even the slightest insult. We do not in this intend to reflect on Mrs. Allan. She proved herself to be a good wife, and a virtuous woman. But had she been of a more delicately sensitive nature, after repelling the first advances or indelicate suggestions of the prisoner, she would never have afforded him the opportunity on May 20th of seeing her; much less would she have invited him into a parlor on the second floor at a time when she was entirely alone in the house. Had she treated him as he deserved, by shutting her door against him, she would have saved herself the attack on her honor which she testifies was made, and the subsequent publicity and trouble to her which followed. This lack of sensitiveness. if the assault was as aggravated as claimed, is again shown by her delay in proceeding to punish, and her statement that she was neither much hurt nor affected by it. Delay in making a complaint has ever been regarded as a fact to be considered in weighing the credibility of a complainant. The reason is that the offense is of such a character, affecting, as it does, that which all true women value most highly, that the natural impulse of a woman who suffered such a grave injury would be to have her outraged honor immediately avenged by the punishment of her assailant. The rule is thus stated by Woodruff, J.:

"In a case in which the fact of complaint is admissible, it is perhaps competent to explain the want of such early complaint by facts which show that it was impracticable, or that it was prevented by circumstances consistent with the natural impulse to complain thereof, so far at least as to destroy that presumption of falsehood derivable from concealment on the part of the female." Baccio v. People, 41 N. Y. 271.

Taking all her explanations of the delay in complaining, these are hardly consistent with a view that the prisoner was guilty of any such aggravated assault as she finally testified upon the trial. She stated that he did not injure or affect her much by the attack, which he must necessarily have done if made in the way, and to the extent, claimed. The prisoner, apart from his untruthful statement of what actually occurred at the interview, was shown to be a man in comfortable circumstances, having a wife and child. Many reputable witnesses were produced to his good character. Weighing the unsatisfactory character of the evidence against him, and giving the weight which ordinarily should attach to proof of good character, a reasonable doubt is created as to defendant's guilt of the crime of assault in the second degree, which is defined "as assault with intent to commit a felony," or, in this case, "rape," but which would, under the instructions of the learned recorder, have justified a conviction of the lesser offense, or assault in the third degree, which, in view of the annoyance to which the prisoner subjected the complainant, would be his proper punishment. We do not see, upon such unsatisfactory evidence, no mental or physical harm having resulted to complainant, what public or private good would be conserved by consigning the prisoner, a man of family, with a character shown to have been good previously, to a long term in the penitentiary. Upon a careful review of the entire evidence, we do not regard the verdict as justified, because not based upon that character of evidence which appellate tribunals insist shall form the basis of a verdict which consigns a man of previous good character to a long term of imprisonment. We are of opinion, therefore, that the judgment should be reversed, and a new trial had.

VAN BRUNT, P. J. The defendant was convicted of an assault upon the complainant with intent to commit a rape. Repeated examinations have convinced me that there is no ground in the evidence, as produced upon the trial, upon which to sustain such a conviction. It is true that there are no exceptions contained in the record, which raises a point which seems to be fatal to the conviction; but under the general power which the court has, in furtherance of justice, in cases of this kind, it seems to me that there should be a reversal of the conviction, as had. If the defendant had been convicted of an indecent assault, (assault in the third degree,) such a conviction might very well, upon the evidence, have been sustained. But there seems to be absent from the evidence, as it appears in this record, an intent to have sexual intercourse with the complainant against her will,—a necessary ingredient of the crime of which the defendant has been convicted. And I am led to this conviction from the testimony given upon the part of the complainant. It appears that prior to the alleged attempt the com-

plainant had had various interviews with the defendant,—one on the 29th of April,—in which the question of the ownership and the proposed sale of certain property owned by the complainant's husband formed the subject of conversation.    On the 6th of May the defendant called again, and an interview was had in the hall, the children of the complainant playing around, in which the question of the sale of the house was again spoken of; and the defendant asked if the complainant would see a customer, and she said, "Yes."    He said, "Well, I will be here in a week or two with him."    Then the defendant stated that he desired to see the husband of the complainant.    She told him that he could not see her husband; that he would be gone a couple of years, in Texas.    Then the defendant made a remark that it was a pity that the complainant should be left alone without a husband for two years, and the complainant replied that it was none of his business; that she did not want to hear any such talk, and, if he was prepared to talk like that, he had better go.    He said: "I beg your pardon.    I don't mean anything wrong.    I know a great many women who would not take any insult from that."    She said:  "I do.    I don't want any such talk. I have cut my eyeteeth, and lost them.    I don't want any such talk." He said, "That is all right," and he was going to go, but it commenced to shower, and he had no umbrella; and, as complainant could not shut the door in his face, she said, "You had better wait until the shower is over;" and he sat down on the lounge, and waited in the main hall downstairs.    In about two weeks, on the 20th of May, he called again, and the complainant opened the door.    He saluted her by saying: "Good morning.    You look very pleasant this morning."    She said: "I am not at all well.    I have had two chills.    I am expecting my mother down."    She then asked, "Where is your customer?"    He said, "I have not had the pleasure of seeing him."    But he said:  "I want to talk to you further about this matter.    The price you ask is too much, altogether.    I have also some papers that I would like you to read or sign, if you see fit."    Complainant said:  "' Well, I don't keep pen and ink down here, but I have them upstairs,' and I asked him into the parlor.    He went upstairs, into the parlor, with me,—I went first,—and followed me into the room, and, as we went in, I went in first, and he closed the door behind us.    When he closed the door, I said:  'Don't close the door.    It's too warm in here.'    He said, ' Well, I've got business, and I don't want anybody to hear me saying my business.'    I said, 'There is nobody in the house to hear you, and I want to open the door;' and when I went to open the door he seized me by my hands."    And then occurs the interview which formed the basis of this conviction,—an interview lasting from 15 to 20 minutes. On the 27th of May the defendant called again upon the complainant, and remained in the lower hall, and she talked to him from the stairs. She refused to have any business transactions with him, whatever, and stated that she had enough trouble of her own, without a dirty loafer like him coming around.    On the 18th of June the complainant heard that the defendant had called again, and on the 19th went to consult a lawyer: and a note dated the 20th was written by the lawyer to the de-

fendant, saying that the complainant "has consulted me as to some annoyances which she claims to have been subjected to by you; and I have advised her that it will be unnecessary to take measures at present, further than write to you this note, which I trust will have the effect of you to discontinue your visits." On the 23d of June the complainant saw the defendant at the front gate of the house. She was going in, and told him, "Don't you dare go into that house," and on the same day made the complaint to a police magistrate of the alleged attempt upon the part of the defendant to commit rape upon her. Five or six days afterwards she wrote a letter to her husband, in which she detailed the circumstances of the alleged assault, and the subsequent events, and in which her statement as to what occurred on the interview of the 27th of May is absolutely at variance with the testimony given upon the trial. In her evidence she states that she did not go downstairs, but spoke to him from the stairs. In her letter she says that she went downstairs, and he asked her to be seated. She said, "No, I will not." That he then got hold of her by the shoulders, and tried to force her into a chair, and the servant, whom she told to watch, thought he was trying to kiss her; but she thought he wanted to whisper in her ear, because he kept saying, "Speak low," and she screamed, "No; if you can't speak loud, I will not listen;" and she went upstairs, and left him sitting there.

It seems to me that the conduct of the complainant herself is absolutely inconsistent with the idea that she understood that this defendant had made an assault upon her with intent to commit a rape. It is altogether in harmony with the theory that an indecent assault was committed. But that the complainant, until a long time afterwards, believed that there had been any intent to use violence on the part of the defendant, seems to be entirely inconsistent with the whole atmosphere of the case. It is incredible that while an assault was being committed, with the intent of obtaining the desired end by violence, any dialogue should have been had, such as is detailed by the plaintiff,—laughing, using argument and persuasion, threats upon her part to tell his wife, and have the law upon him,—she showing no fear, and making no outcry, and such like, lasting 15 or 20 minutes, and then finally escaping without any difficulty. This seems to be utterly at variance with the idea that there was any intent upon the part of the defendant to accomplish his object by brute force, or that the complainant so believed. The interview of the 27th May was also inconsistent with the idea that the complainant then believed that the defendant had made an attempt to commit so atrocious a crime against her. So was that of the 22d of June. The letter of the attorney of the 20th, also, does not even hint at the suggestion of so grave an offense. The late complaint, and the letter to her husband, in which she states, in so vital a point, the interview of the 27th of May so differently from that of her testimony upon the trial, further accentuates the probability that the idea of a rape being attempted was not entertained until long after the event.

It further appears, upon an examination of the charge of the learned

recorder, that the jury may have been misled into overlooking the distinction between assault in the second degree and assault in the third degree. It is true that during the charge the learned recorder distinctly stated the difference between the two grades of crime; but in two or three places expressions were used, to which his attention was not called, to be sure, but which may have produced an erroneous impression upon the jury, and particularly as one of them was in answer to a question by the foreman. In one place the learned recorder said: .

"If you come to the conclusion that the evidence would not warrant you in arriving at the conclusion that he intended, in making this assault upon the person of the complainant, to have an act of sexual intercourse with her on that occasion, but that he seized her by the wrist, and pressed her against his person, and struggled with her in that room, he would then be guilty of assault in the third degree, and not of the second, because, unless the evidence satisfies you that the assault was with the felonious intent to commit the felony of rape upon this woman, he cannot be convicted of assault in the second degree."

The last part of this proposition was correct; but the first conveyed an entirely erroneous impression, in that, even if the jury were of the opinion that the evidence would warrant them in arriving at the conclusion that the defendant intended, in making this assault, to have an act of sexual intercourse with her on that occasion, he still might not have been guilty of assault in the second degree. It was only if he intended, in making the assault, to have this act of intercourse on that occasion against her will, that he would have been so guilty. He may have presumed in this struggle that she would finally consent; and if he believed she would finally consent, no matter when, or because of what persuasion, even if some of such persuasion was physical, the charge of attempt to commit rape was not sustained. This erroneous impression was accentuated by the answer which the learned recorder made to the foreman, who asked:

"Will it make any difference, in the degree of assault, if we take into consideration that the man made approaches to the lady, improperly, on his first visit, and was allowed to re-enter the house a second time?"

To this the learned recorder said:

"I told you you had a right to take any evidence of that character into consideration, in determining what the intention of this man was at the time he committed the assault,—whether his intention was to have sexual intercourse with this woman or not."

That was not the question which was to determine whether the defendant was guilty of an assault in the second degree or not. Even if he did intend to have sexual intercourse with her, and the assault was made with such intention, he was not necessarily guilty of assault in the second degree. It was only if he intended to have such intercourse against her will, by force. And in this answer to the jury this important and vital distinction seems to have been lost sight of.

And, again, it seems to me that the recorder may have produced an erroneous impression upon the question of intent by what he stated in reference to the conversation had between the complainant and the defendant at the second interview. He said, referring to the testimony as to the remark which was made about the absence of her

husband, and about the misfortune of a woman of her appearance being compelled to remain absent from her husband for so long a period as two years:

"That, of itself, would probably amount to nothing, if such a remark was made. But, when that remark is taken in connection with what it is claimed subsequently occurred in the parlor between this man and the woman, it is a matter which may have some significance, some bearing, as to what this man's intention was at the time it was alleged by this woman that he assaulted her in the parlor of that house."

It is true that this conversation may have tended to show that, at the time this man assaulted her, he intended to have intercourse with her; but it did not in any way tend to show that he intended to have such intercourse against her will. On the contrary, it seems to me that the legitimate conclusion from that language was that, if there was any such intention, it was that such intercourse should take place by and with her consent.

I think, from all these circumstances, that the conclusion arrived at by the jury was erroneous, and that the defendant should have a new trial. I therefore concur in the conclusion reached by Mr. Justice O'BRIEN.

PATTERSON, J. I do not find any technical errors in the record before us, either in the rulings of the recorder on evidence, or in his charge; and yet, on the whole case, I cannot resist the conclusion that injustice has been done in convicting the prisoner of that degree of crime for which he was sentenced. He might well have been found guilty of assault in the third degree, but the testimony of the complainant is most unsatisfactory, concerning that assault being committed for the purpose of having sexual intercourse with her, against her will, and therefore I concur in the direction for a new trial.